Slip Op. 07-85

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **GERBER FOOD (YUNNAN) CO., LTD. and GREEN FRESH (ZHANGZHOU) CO., LTD.,** |
| Plaintiffs, |
| v. |
| **UNITED STATES**, |
| Defendant, |
| and |
| **COALITION FOR FAIR PRESERVED MUSHROOM TRADE**, |
| Defendant-Intervenor. |

**Before: Timothy C. Stanceu, Judge**

**Court No. 03-00544**

## OPINION AND ORDER

[Remanding for reconsideration the redetermination of the final results of an antidumping administrative review in which the U.S. Department of Commerce applied "facts otherwise available" and "adverse inferences" to certain sales transactions]

Dated: May 24, 2007

*Garvey Schubert Barer* (*William E. Perry*, *Lizbeth R. Levinson*, and *Ronald M. Wisla*) for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder*); *Scott D. McBride*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Collier, Shannon, Scott, PLLC* (*Michael J. Coursey* and *Adam H. Gordon*) for defendant-intervenor.

Stanceu, Judge: Before the court is the redetermination issued by the International Trade

Administration, U.S. Department of Commerce ("Commerce," or the "Department") pursuant to

the court's remand order in *Gerber Food (Yunnan) Co. v. United States*, 29 CIT __,

387 F. Supp. 2d 1270 (2005) ("*Gerber I*").  In *Gerber I*, the court held that the Department's

final results in the third administrative review of an antidumping duty order applying to imports

of certain preserved mushrooms from the People's Republic of China ("China" or the "PRC")

were not supported by substantial evidence, and were otherwise not in accordance with law, in

the application of the "facts otherwise available" and "adverse inferences" provisions of

19 U.S.C. § 1677e (2000).  Because the redetermination complies with the remand order in

*Gerber I* and with applicable law in some respects but not others, the court remands the

redetermination to Commerce for further proceedings consistent with this Opinion and Order.

## I. Background

Commerce issued the final results of the third administrative review in July 2003 ("Final

Results").  *Certain Preserved Mushrooms From the People's Republic of China: Final Results*

*and Partial Rescission of the New Shipper Review and Final Results and Partial Rescission of*

*the Third Antidumping Duty Administrative Review*, 68 Fed. Reg. 41,304 (July 11, 2003) ("*Final*

*Results*").  Plaintiffs Gerber Food (Yunnan) Co., Ltd. ("Gerber"), a Chinese producer of

preserved mushrooms, and Green Fresh (Zhangzhou) Co., Ltd. ("Green Fresh"), a Chinese

exporter, contested the Final Results in an action brought in the Court of International Trade in

August 2003.  That action culminated in the court's decision in *Gerber I*, which remanded the

matter back to the agency for reconsideration and redetermination.  *See Gerber I*, 29 CIT at __,

387 F. Supp. 2d at 1291.  The court's opinion in *Gerber I* sets forth the procedural background of

this proceeding; pertinent details about the procedural background are summarized herein.  *See*

*id.*, 29 CIT at __, 387 F. Supp. 2d at 1273-78.

Commerce issued an antidumping duty order on certain preserved mushrooms from China in 1999.  *See Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From the People's Republic of China*, 64 Fed. Reg. 8308 (Feb. 19, 1999).  Plaintiffs Gerber and Green Fresh participated in the third administrative review of the antidumping duty order, which pertained to entries of subject mushrooms made during the period beginning February 1, 2001 and ending January 31, 2002 (the "period of review" or the "POR").  *Final Results*, 68 Fed. Reg. at 41,305.

In the Final Results, Commerce relied on its authority under 19 U.S.C. § 1677e in assigning to each of the two plaintiffs an antidumping duty assessment rate of 198.63 percent, based on a procedure that Commerce termed "total adverse facts available."  *Id.* at 41,306-07. Commerce acted on its findings that Gerber and Green Fresh, during the period of review, had entered into a business relationship to circumvent the antidumping laws by improperly allowing Gerber to take advantage of Green Fresh's comparatively low cash deposit rate.  *Id.*  According to Commerce, Gerber and Green Fresh misrepresented the nature of their business relationship by setting forth Green Fresh as Gerber's agent for purposes of arranging the export shipments of Gerber's merchandise.  *See id.*  Commerce concluded that despite the parties having entered into an agreement under which Green Fresh was to provide services in arranging for export shipments of Gerber's mushrooms, "Gerber in fact arranged shipment of all of its sales of subject merchandise and paid Green Fresh a fee to use Green Fresh's sales invoices for this purpose in order to take advantage of Green Fresh's comparatively low cash deposit rate during the POR . . . ."  *Id.* at 41,306.  Commerce concluded that as a result of the parties' misrepresentations in their questionnaire responses and the circumvention of cash deposit requirements, all of the

information submitted by the two parties during the administrative review that was required for

the calculation of individual antidumping duty assessment rates was unreliable and could not be

verified.  *Id.* at 41,306-07.  In addition, Commerce invoked its authority under 19 U.S.C. § 1677e

to deter circumvention of the antidumping laws.  *Id.* at 41,307.  Based on its various findings,

Commerce, in the Final Results, assigned both Gerber and Green Fresh the 198.63 percent

assessment rate, which corresponded to the highest rate assigned to any party in the third

administrative review and the rate that Commerce assigned to parties that had failed to establish

independence from control of the government of the PRC.  *Id.* at 41,309.

The Final Results departed from the approach Commerce had taken in the preliminary

results of the third administrative review, which Commerce had issued in March 2003

("Preliminary Results").  *See Certain Preserved Mushrooms from the People's Republic of*

*China: Prelim. Results and Partial Rescission of Fourth New Shipper Review and Prelim.*

*Results of Third Antidumping Duty Administrative Review*, 68 Fed. Reg. 10,694, 10,697 (Mar. 6,

2003) ("*Preliminary Results*").  In the Preliminary Results, Commerce discussed disapprovingly

the export agency agreement between Gerber and Green Fresh but nevertheless calculated

preliminary antidumping duty margins for each respondent that did not involve the use of facts

otherwise available or adverse inferences.  *Id.* at 10,697, 10,702.  Commerce calculated

preliminary antidumping duty margins of 1.17 percent for Gerber and 46.41 percent for Green

Fresh.  *Id.* at 10,702.  Commerce acknowledged in the Preliminary Results that Gerber and Green

Fresh had revealed their business relationship to Commerce on the record but also concluded that

"this relationship resulted in evasion of antidumping cash deposits during the POR."  *Id.*

at 10,697.  At that time, Commerce explained that "[t]he Department has preliminarily calculated

an individual margin for each of these respondents based on the data reported by each of them,

adjusted to reflect verification findings, which it will also use to calculate importer-specific

assessment rates." *Id.*  Noting its "concern[] that antidumping duty cash deposits may be evaded

again in subsequent PORs," Commerce stated its intention to assign to both Gerber and Green

Fresh, for purposes of the cash deposit, the higher of the antidumping duty rates calculated in the

Preliminary Results for either respondent, *i.e.*, the 46.41 percent antidumping duty rate calculated

for Green Fresh.  *Id*.

        The court in *Gerber I* held that the Department's application of the 198.63 percent rate to

all transactions of Gerber and Green Fresh for the period of review was unsupported by

substantial evidence on the record and was otherwise not in accordance with law.  *Gerber I*,

29 CIT at __, 387 F. Supp. 2d at 1272-73.  The court concluded that Commerce did not support

with substantial record evidence certain findings of fact and failed to explain its determination

adequately.  *Id.*, 29 CIT at __, 387 F. Supp. 2d at 1278-80.  The court concluded that in the

absence of such supported findings of fact, Commerce exceeded its authority in applying the

"facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e to reject all

the information submitted by the two plaintiffs.  *Id.*  The court also concluded that the

Department's assignment of the 198.63 percent assessment rate to all transactions of the two

plaintiffs could not be justified by deference to the agency's construction of 19 U.S.C. § 1677e or

by deference to a construction of the antidumping laws in general to allow Commerce to exercise

its inherent authority to prevent circumvention of these laws.  *Id.*, 29 CIT at __, 387 F. Supp. 2d

at 1278, 1288-1290.  The court further concluded that Commerce was required to calculate

individual assessment rates for Gerber and Green Fresh in accordance with applicable statutory

requirements and, if resorting to facts otherwise available, to "identify what information needed

to calculate those assessment rates is unavailable or is deficient . . . so as to require the use of the

'facts otherwise available' procedure of 19 U.S.C. § 1677e(a)." *Id.*, 29 CIT at __, 387 F. Supp.

2d at 1290.  The court added that "[i]f Commerce determines that any information that was

submitted by either plaintiff and is necessary to the calculation of the individual assessment rates

is unverifiable, then it must identify that specific information and provide a reasoned and

supported analysis of any decision to deem that specific information unverifiable." *Id.*  Finally,

the court concluded that if Commerce "uses any inferences adverse to either plaintiff in selecting

from among the facts otherwise available, Commerce must explain its conclusion, based on

substantial evidence on the record, that the party in question failed to cooperate to the best of its

ability in providing information that was needed to calculate the individual assessment rate." *Id.*

　　　　In the redetermination that it issued pursuant to the remand in *Gerber I*

("Redetermination"), Commerce calculated individual antidumping duty assessment rates for

each of the two plaintiffs.  *See Redetermination Pursuant to Ct. Remand* at 6 (Dec. 1, 2005)

("*Redetermination*").[1]  As it had in the Final Results, Commerce invoked the "facts otherwise

available" and "adverse inferences" provisions, but rather than apply these provisions to all

information submitted during the review by the two parties, Commerce limited the application to

a group of twenty-four individual sales transactions of subject merchandise produced by Gerber

that was exported to the United States and entered during the period of review.  *Id.* at 49-51.

---

[1] This Opinion refers to and quotes information contained in the Confidential
Administrative Record filed on October 16, 2003.  Certain such information was initially
designated as proprietary in the administrative proceedings but later was made public in the
Redetermination and elsewhere.  Because such information is now public, the court has omitted
from the text the brackets used in the original documents.

Commerce selected these twenty-four transactions because it concluded that these were the

transactions for which Green Fresh was claimed to be the exporter in the documentation that had

been submitted to United States Customs and Border Protection ("Customs") at the time of entry.

*Id.* at 50.  To those twenty-four transactions, Commerce continued to assign the antidumping

duty rate of 198.63 percent.  *Id.* at 50-51.

        To calculate Gerber's assessment rate, Commerce relied on the "facts otherwise

available" and "adverse inferences" provisions of § 1677e in assigning the 198.63 percent rate to

each of the twenty-four transactions.  *Id.* at 6, 49-50.  Commerce used pertinent information

developed during the review, with certain adjustments, but without resort to the "facts otherwise

available" or "adverse inferences" provisions of 19 U.S.C. § 1677e, in performing the

antidumping duty calculation for the remaining ten of Gerber's sales transactions of subject

merchandise subject to the review.[2]  *Id.* at 6, 49-51, 54-56.  This method reduced Gerber's

overall assessment rate for the third administrative review from the 198.63 percent rate

determined in the Final Results to 150.79 percent.  *Id.* at 6.

        To calculate Green Fresh's assessment rate, Commerce attributed to Green Fresh the

twenty-four sales transactions for which it found that the entry documentation submitted to

---

        [2] With respect to the assessment rates for Gerber and Green Fresh, Commerce made
certain changes from the method it used to calculate normal value for purposes of calculating the
preliminary antidumping duty margins in the Preliminary Results.  *Redetermination* at 54-55.
These changes, which affected the surrogate values, were not opposed by Gerber or Green Fresh
in their comments on the Redetermination.  Defendant-intervenor provided Commerce with
comments in response to the Redetermination in which defendant-intervenor disagreed with the
Department's decision not to value laterite as an input.  *Id.* at 55-56.  In its brief responding to
plaintiffs' comments on the Redetermination, defendant-intervenor does not raise this issue and
does not disagree with any position taken by Commerce in the Redetermination.  *See* Def.-
Intervenor's Reply to Pls.' Comments on the U.S. Commerce Department's Remand
Determination ("Def.-Intervenor's Reply").

Customs by Gerber identified Green Fresh as the exporter.  *Id.* at 50-51.  To do so, Commerce

invoked its authority under § 1677e.  Commerce, however, had found as facts that Gerber was

the producer and exporter of the merchandise that was the subject of those twenty-four sales

transactions.  *Id.* at 29-30, 49-51.  In the calculation of Green Fresh's assessment rate, Commerce

assigned to those twenty-four transactions the antidumping duty rate of 198.63 percent.  *Id.* at 6.

Commerce used pertinent information developed during the review, with certain adjustments, but

without resort to "facts otherwise available" or "adverse inferences," in performing the

antidumping duty calculation for the 134 sales transactions in which Green Fresh actually

exported merchandise that was subject to the administrative review.  *Id.* at 6, 18-19, 49-51,

54-56.  This merchandise had been produced by Green Fresh's affiliated producer, Lubao.  *Id.*

at 18.  The result of these calculations was to reduce Green Fresh's assessment rate from the

198.63 percent determined in the Final Results to 84.23 percent.  *Id.* at 6.

## II. JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction in this case pursuant to 28 U.S.C. § 1581(c) (2000).  The

court must determine whether the Redetermination complies with the remand order in *Gerber I*,

sets forth findings of fact that are supported with substantial evidence on the record, and is

otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

"Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938).  The court must consider the entire record, including both

evidence that supports the decision by the agency and such evidence that "fairly detracts from the

substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir.

1984).  To be affirmed under the substantial evidence standard of review, an agency "must

examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation

omitted).  The court, however, will not substitute its judgment for that of the agency when the

choice is "between two fairly conflicting views, even though the court would justifiably have

made a different choice had the matter been before it *de novo*."  *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951).

### III.  DISCUSSION

The Redetermination presents the general issue of whether Commerce properly invoked

and applied the "facts otherwise available" provision of 19 U.S.C. § 1677e(a) and the "adverse

inference" provision of 19 U.S.C. § 1677e(b) in calculating the separate antidumping duty

assessment rates of 150.79 percent for Gerber and 84.26 percent for Green Fresh.

*Redetermination* at 5-6.  To support the application of these two provisions, Commerce, in the

Redetermination, must support with substantial record evidence the findings of fact required by

§ 1677e and adequately must explain its reasoning.

The court addresses below four issues that arise from the Redetermination: (A) whether

Commerce supported with substantial record evidence the factual findings required under

subsection (a) of § 1677e in invoking the "facts otherwise available" provision as to each

plaintiff; (B) whether Commerce supported with substantial record evidence its findings that

each plaintiff failed to cooperate to the best of its ability in responding to an information request

from Commerce so as to justify the drawing of "adverse inferences" as to each plaintiff;

(C) whether Commerce acted lawfully in imputing to Gerber and also to Green Fresh the twenty-

four sales transactions involving merchandise produced by Gerber for which Commerce found as

a fact that the entry documentation presented to Customs identified Green Fresh as the exporter;

and (D) whether Commerce acted lawfully in applying the 198.63 percent rate to those twenty-

four transactions in reliance on § 1677e.

  The court concludes that for the purpose of invoking the "facts otherwise available"

provision, Commerce supported with substantial record evidence its findings that each

respondent withheld requested information and significantly impeded the administrative review

proceeding by providing unsatisfactory responses to the Department's requests for information

on the issue of the identity of the exporter for certain of the transactions subject to the review.

The court also concludes that for the purpose of invoking the "adverse inferences" provision,

Commerce supported with substantial record evidence its finding that each plaintiff, in

responding to the Department's requests for information, failed to cooperate by not acting to the

best of its ability.  The court further concludes that Commerce did not explain adequately how its

decision to attribute the aforementioned twenty-four transactions both to Gerber and to Green

Fresh, on the record facts of this case, comported with 19 U.S.C. § 1677e.  Finally, the court

concludes that Commerce erred in assigning the 198.63 percent rate; Commerce failed to

establish a rational relationship between the 198.63 percent rate and the actual transaction-

specific margins of Gerber or Green Fresh.

A.  The Department's Findings that Both Plaintiffs Withheld Requested Information and Substantially Impeded the Review Proceeding Are Adequately Supported by Record Evidence

Commerce may invoke its authority to apply facts otherwise available under subsection (a)(1) of § 1677e or any of the four subparagraphs in subsection (a)(2) of § 1677e. Under § 1677e(a)(1), Commerce may invoke facts otherwise available when "necessary information is not available on the record[.]"  19 U.S.C. § 1677e(a).  As the court discussed in its opinion in *Gerber I*, Commerce found during the administrative review that it possessed all the information it needed to calculate future antidumping duty assessment rates for Gerber and for Green Fresh and used that information in calculating preliminary margins.  *Gerber I*, 29 CIT at __, 387 F. Supp. 2d at 1279, 1282-83.  Commerce specifically found as facts that such information was on the record, that it had verified the information, and that the information was usable for the future calculation of assessment rates.  *See id.*  As the court observed, "other than the record evidence regarding the export agency agreement, Commerce found few discrepancies with the information that Gerber and Green Fresh provided, and Commerce resolved any inaccuracies found during verification."  *Id.*, 29 CIT at __, 387 F. Supp. 2d at 1282.  In the Redetermination, Commerce does not expressly conclude with respect to § 1677e(a)(1) that the information needed to calculate individual assessment rates for Gerber and Green Fresh is unavailable on the record.

Instead, Commerce claimed in the Redetermination that substantial record evidence supports the application of facts otherwise under subparagraphs (A) through (D) of § 1677e(a)(2) with respect to both plaintiffs, and with respect to the transactions that involved merchandise produced by Gerber and for which the entry documentation submitted to Customs identified

Green Fresh as the exporter.[3]  *See Redetermination* at 31-33 (citing 19 U.S.C. § 1677e(a)(2)).

Commerce concluded that both Gerber and Green Fresh withheld requested information and

thereby satisfied the criterion of subparagraph (A) of § 1677e(a)(2).  *Id.* at 31-32.  Commerce

also found that the parties provided new information at verification, thereby satisfying

subparagraph (B), under which the facts otherwise available provision may be invoked if

information is provided after the applicable deadline.  *Id.*  Commerce concluded that, for

purposes of subparagraph (C), both parties significantly impeded the administrative review

proceeding, and that, with respect to subparagraph (D), both provided unverifiable information.

*Id.* at 32-33.  Much of the discussion that the Redetermination addresses to these various findings

is directed, broadly and generally, to the parties' disclosure of information about their

commercial relationship as it pertained to their respective roles in the export agency agreement.

Not all of this discussion is pertinent to the identification of the specific record information that

is needed for the calculation of antidumping duty assessment rates for the two parties, and not all

of it is relevant to the narrow question of whether the manner in which the parties disclosed that

specific information in response to the Department's requests justified a resort to facts otherwise

available under one or more of the four separate criteria of § 1677e(a)(2).

---

[3] Under § 1677e(a)(2), Commerce may invoke "facts otherwise available" in any of the following four situations where a party:

    (A) withholds information that has been requested by the administering authority . . . under this subtitle,

    (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

    (C) significantly impedes a proceeding under this subtitle, or

    (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title[.]

19 U.S.C. § 1677e(a)(2).

Commerce does not provide adequate reasoning for concluding that subparagraphs (B)

and (D) of § 1677e(a)(2) authorize the resort to "facts otherwise available."  Although there may

be evidentiary support for the Department's findings in the Redetermination that certain

information submitted by the parties was provided late or was unverifiable for purposes of

subparagraphs (B) and (D) of § 1677e(a)(2), respectively, Commerce does not explain

satisfactorily in the Redetermination how those findings invalidate the Department's prior

finding in the Preliminary Results that it could calculate importer-specific assessment rates from

data the parties submitted and Commerce verified.  *See Redetermination* at 32-36; *Preliminary*

*Results*, 68 Fed. Reg. at 10,697, 10,702.  Nor does Commerce explain how any late or

unverifiable information was related to the execution and reporting of the twenty-four sales

transactions at issue.  *See Redetermination* at 32-36.

Despite the shortcomings the court finds to exist in the Redetermination, the court

concludes that Commerce in the Redetermination made findings of fact, supported by substantial

record evidence, sufficient to justify the use of facts otherwise available pursuant to

§ 1677e(a)(2)(A) and (C), as discussed in this Opinion and Order.  *See Redetermination* at 9-15,

17-22, 26-28, 31-37.  A factual finding that a party withheld requested information or

significantly impeded the administrative review proceeding so as to satisfy subparagraphs (A) or

(C) of § 1677e(a)(2), respectively, is sufficient, standing alone, to justify the Department's use of

facts otherwise available for specific responses and specific information, provided Commerce

adheres to all statutory requirements, particularly those of 19 U.S.C. § 1677m.  19 U.S.C.

§ 1677e(a).

When a party withholds requested information or significantly impedes a proceeding,

Commerce "shall, subject to Section 1677m(d) of this title, use the facts otherwise available in

reaching the applicable determination under this subtitle." *Id.*  Under § 1677m(d), after having

provided a respondent the opportunity to remedy, to the extent practicable, deficiencies in a

response to a request for information, Commerce may disregard all or part of the original

response to the request for information, and the responses to the subsequent requests, if it finds

that those responses are not satisfactory, unless the information provided satisfies all of the

criteria of § 1677m(e).  *Id.* § 1677m(d).  One of those criteria is that the submitter demonstrate

that it acted to the best of its ability in providing the requested information.  *Id.* § 1677m(e)(4).

Because of this requirement in § 1677m(e)(4), the court does not construe § 1677e(a)(2) and (b),

and § 1677m(d) and (e), when read together, to preclude Commerce from invoking the facts

otherwise available and adverse inference provisions in all instances in which Commerce, despite

initially receiving unsatisfactory responses to its information requests, eventually obtains from an

interested party, and verifies, the information it requested in conducting an administrative review

under 19 U.S.C. § 1675 (2000).  If the court were to so construe these related provisions, a

participant in the administrative review would incur no adverse consequences for withholding

requested information until the later stages of the questionnaire process, or for significantly

impeding the review by repeatedly providing questionnaire responses with significant

deficiencies, and thereby failing to act to the best of its ability in providing the information

requested.  The plain meaning of §§ 1677e and 1677m is to the contrary.

Congress did not limit 19 U.S.C. § 1677e(a) to those instances in which information

necessary to a determination is unavailable on the record.  Although Congress, in

subsection (a)(1), authorized the reliance on facts otherwise available in a situation where

information was deficient or missing, Congress also provided for the use of facts otherwise

available in four other situations specified in subsection (a)(2). *See id.* § 1677e(a). Commerce

may apply the facts otherwise available provision in situations in which a party, *inter alia,*

withheld requested information or significantly impeded a proceeding, as specified in

subparagraphs (A) and (C) thereof. *Id.* § 1677e(a)(2)(A), (C). The inclusion of subparagraphs

(A) and (C) signifies that Commerce is not confined, in deciding to resort to facts otherwise

available, to instances in which information necessary to the specific determination is missing,

submitted late, or unverifiable. For example, a party's response to the Department's request for

information could contain the necessary, verifiable information yet still be unsatisfactory in other

respects, such as by also including other statements that contradict that information, causing the

agency to make further inquiries that otherwise would not have been required. Also, a party's

unresponsiveness and failure to cooperate prior to providing the needed and verifiable

information might significantly and unnecessarily impede the proceeding and waste the

Department's resources.

In 19 U.S.C. § 1677m(d), Congress expressly authorized Commerce to disregard all or

part of unsatisfactory responses to its requests for information, subject to two qualifications.

First, as mentioned above, Commerce may not disregard deficient responses without first

informing the submitter of the deficiency and, to the extent practicable, providing the submitter

the opportunity to remedy or explain the deficiency in light of the statutory time limits for

completing the review. *Id.* § 1677m(d). Second, under § 1677m(e), Commerce may not

disregard information necessary to a determination, even if the information does not meet all

applicable requirements, if a party demonstrates that it acted to the best of its ability in providing

that information and that the information was timely submitted, verifiable, sufficiently complete

to serve as a reliable basis for reaching the applicable determination, and usable without undue

difficulties. *Id.* § 1677m(e). When construed together, §§ 1677e and 1677m afford Commerce

recourse if a party fails to cooperate by filing initial and subsequent questionnaire responses that

are so unsatisfactory as to support a finding that the party withheld requested information or

significantly impeded the review proceeding by providing those responses. Nevertheless, when

invoking facts otherwise available under § 1677e(a)(2)(A) or (C), Commerce must support with

substantial record evidence its findings that a party withheld requested information or

significantly impeded a proceeding. In addition, Commerce must present adequate reasoning for

its conclusions.

Commerce, in the Final Results, relied specifically on findings that the two parties had

failed to disclose initially the fact that they did not adhere to the original terms of the export

agency agreement and that Green Fresh failed to provide supporting documentation for

shipments that Gerber made using Green Fresh's invoices. *Final Results*, 68 Fed. Reg.

at 41,306-07; *see Gerber I*, 29 CIT __, 387 F. Supp.2d at 1281-82. Commerce did not explain in

the Final Results how these findings related to the determination of assessment rates and thereby

could justify the Department's particular application of facts otherwise available under 19 U.S.C.

§ 1677e(a)(2)(A). Commerce instead discussed its findings on the withholding of information in

the general context of misrepresentations by Gerber and Green Fresh regarding their relationship

and the export agency agreement. *See Final Results*, 68 Fed. Reg. at 41,306-07. Based on such

statements, Commerce determined that "the business relationship which existed between Gerber

and Green Fresh resulted in evasion of antidumping cash deposits during the POR" and that the

parties "actively colluded to circumvent the cash deposit rates in effect during the POR." *Id.*

at 41,306.  Commerce, however, did not explain how information about alleged evasion or

circumvention of cash deposits during the period of review resulted in a factual finding that

Gerber or Green Fresh had withheld information material to the determination of assessment

rates in the administrative review.  Commerce instead stated that Gerber's alleged

misrepresentations impugned the veracity of all of Gerber's responses and Commerce therefore

excluded all of the information Gerber had submitted.  *Id.* at 41,306-07.  Concerning the possible

impeding of the proceeding for purposes of § 1677e(a)(2)(C), the court concluded in *Gerber I*

that Commerce, although invoking § 1677e(a)(2)(C) in the Final Results, did not support or

explain its conclusion that Gerber and Green Fresh significantly had impeded the administrative

review.  *Gerber I*, 29 CIT at __, 387 F. Supp. 2d at 1284.  "With respect to criterion (C) of

§ 1677e(a)(2), Commerce did not reveal its reasoning and failed to cite to evidence on the record

that could support a finding that the administrative review proceeding was 'significantly

impeded' as a result of actions taken by either Gerber or Green Fresh."  *Id.*

In the Redetermination, Commerce supports its findings that both respondents, through

questionnaire responses addressing the identity of the exporter in specific transactions, withheld

requested information necessary to the determination and calculation of assessment rates and

significantly impeded the administrative review.  As to the information regarding the identity of

the exporter, Commerce explains in the Redetermination, and the court agrees, that the identity of

the exporter and the reporting of the correct sales transactions are critical to the determination of

assessment rates.  *See Redetermination* at 33 ("It is entirely reasonable to find that providing

confusing, misleading, and often false responses to questions such that the agency is unable to

discern who is the exporter that should be reporting the sales and how many sales are affected

significantly impedes a review . . . ."); 19 U.S.C. § 1675(a)(2)(A) (requiring Commerce, in an

administrative review, to determine "the normal value and export price (or constructed export

price) of each entry of the subject merchandise").

      Record evidence supports the Department's finding that the questionnaire responses of

both plaintiffs on the issue of the identity of the exporter for certain transactions involved in the

administrative review were, on the whole, unsatisfactory.  Some of the responses were

misleading or false in informing Commerce that Gerber was a supplier of subject merchandise to

Green Fresh during the period of review and that Green Fresh was the exporter of Gerber-

produced merchandise exported to the United States.  As Commerce eventually came to

understand during the administrative review, all of Green Fresh's export shipments during the

period of review involved subject merchandise produced by Lubao, not Gerber; Commerce

eventually confirmed that Gerber, not Green Fresh, actually exported all the merchandise

involved in the review that Gerber had produced.  *See Redetermination* at 15, 18-19.  Some

responses relevant to the question of the identity of the exporter, although not necessarily false,

were confusing and contradictory of other statements by the same respondent.  *See*

*Redetermination* at 9-15, 17-22, 26-28.

      In the Redetermination, Commerce cites to and quotes from various information requests

and various responses of Gerber and Green Fresh.  *See id.*  Upon review of these information

requests and responses, and others on the record, the court concludes that substantial evidence

supports the Department's findings that both parties withheld information that was material to

the determination and calculation of individual assessment rates for transactions involving

subject merchandise produced by Gerber, and that certain of the responses of each of the

plaintiffs were so unresponsive and misleading, and in some instances so inaccurate, that they

impeded the review significantly.

      With respect to Gerber, some examples from the record will suffice to show the

evidentiary support for the Department's findings.  In Section A of its questionnaire, Commerce

directed every respondent to contact it within two weeks of receiving the questionnaire if the

respondent was aware that any of the merchandise that it sold to another company in the

respondent's country was ultimately shipped to the United States.  Gerber responded, stating that

> Gerber transacted some sales during the period of review through an agent[,]
> Green Fresh, who was paid a commission for its services.  For those sales
> transacted through Green Fresh, Gerber negotiated the price with the U.S.
> customer and at all times was aware that the product was destined for the United
> States.  Green Fresh acted as the exporter of record, however.

*Gerber Section A Resp.* at A11-A12 (May 23, 2002) (Confidential Admin. R. Doc. No. 2); *see*

*Redetermination* at 9.  Because Green Fresh was not a reseller of Gerber's merchandise, Gerber's

response was unnecessary.  It was also misleading.  Gerber did not sell to Green Fresh any

merchandise involved in the review, and during the period of review, Green Fresh performed no

function related to the sale of Gerber's merchandise.

      In its first supplemental questionnaire to Gerber, Commerce requested that Gerber

provide a copy of the export agency agreement and asked, in that context, "[w]hat services did

Green Fresh provide?" and "[w]hy was Green Fresh the exporter of record?"  *Gerber First*

*Supplemental Questionnaire* at 2 (June 28, 2002) (Confidential Admin. R. Doc. No. 8); *see*

*Redetermination* at 26.  In its response, Gerber stated that "Green Fresh exported the product to

the United States." *Gerber First Supplemental Resp.* at 3-4 (Aug. 2, 2002) (Confidential Admin. R. Doc. No. 14); *see Redetermination* at 26. This response was so at variance with the actual circumstances of Green Fresh's role that Commerce was justified in considering it false. The record establishes, and neither plaintiff contests, that Green Fresh never took title or possession of any of the Gerber-produced merchandise involved in the review, had no role in the sale of the merchandise, and did not arrange for the transport of the merchandise from China to the United States. The statement by Gerber that Green Fresh exported the product to the United States was not qualified elsewhere in Gerber's first supplemental response. The unqualified statement is perplexing when read together with Gerber's subsequent questionnaire responses.

Commerce again sought clarification in a second supplemental questionnaire: "Please define and discuss the role Green Fresh played when it acted as an agent in the sale of Gerber merchandise. When did Green Fresh begin acting as an agent in the sale of Gerber merchandise?" *Gerber Second Supplemental Questionnaire* at 2 (Aug. 13, 2002) (Confidential Admin. R. Doc. No. 16); *Redetermination* at 11. Gerber's response begins evasively by answering the second question but not the first. Gerber's answer to the second question, "Green Fresh acted as an agent for the sale of Gerber merchandise from Sept[.] 2001 to May 2002[,]" is itself less than satisfactory. *Gerber Second Supplemental Resp.* at 6 (Sept. 11, 2002) (Confidential Admin. R. Doc. No. 30); *Redetermination* at 12. Like Gerber's statement in its first supplemental response, the response to the second supplemental questionnaire suggests, misleadingly, that Green Fresh had performed some function related to the sale of Gerber's merchandise. The answer is evasive in failing to inform Commerce of the actual facts. Commerce, in asking the question, was proceeding upon the reasonable (given Gerber's response

to the first supplemental questionnaire), but incorrect, assumption that Green Fresh was a sales

agent for Gerber.  At the least, Gerber should have informed Commerce that Green Fresh was not

a reseller and that its role had nothing to do with the sale of the merchandise.  Absent that

information, Commerce did not get a straightforward confirmation that Green Fresh's activities

were irrelevant to the determination of antidumping duty liability on the affected entries.

      In a third supplemental questionnaire, Commerce asked Gerber, once again, to describe

the respective roles of Gerber and Green Fresh in sales that involved merchandise made by

Gerber but sold by Green Fresh.  *Gerber Third Supplemental Questionnaire* at 1-2 (Nov. 22,

2002) (Confidential Admin. R. Doc. No. 37); *Redetermination* at 13.  In the first sentence of its

response, Gerber stated that twenty-four of its total of thirty-four sales transactions made by

Gerber during the review "were made through Green Fresh."  *Gerber Third Supplemental Resp.*

at 2 (Dec. 23, 2002) (Confidential Admin. R. Doc. No. 42); *Redetermination* at 13.  This

sentence might be characterized merely as vague, but the second sentence was misleading and

incorrect: "We have conferred with Green Fresh and learned that they mistakenly did not report

all of the sales made by it on our behalf."  *Gerber Third Supplemental Resp.* at 2 (Dec. 23, 2002)

(Confidential Admin. R. Doc. No. 42); *Redetermination* at 14.  It is undisputed that Green Fresh

made no sales on behalf of Gerber and, accordingly, should not have reported any such sales.

The next sentence informed Commerce–misleadingly and, as it turned out, incorrectly–that

Green Fresh was amending its sales listing to "reflect a total of 24 sales made on behalf of Gerber

in response to their latest questionnaire."  *Gerber Third Supplemental Resp.* at 2 (Dec. 23, 2002)

(Confidential Admin. R. Doc. No. 42); *Redetermination* at 14.  The remainder of the response,

which states that Green Fresh is a shipping agent for Gerber's exports to the United States and

that Green Fresh "had no role at all in choosing customers or establishing price" appears to be

inconsistent with the attribution to Green Fresh of sales of Gerber's merchandise in the beginning

of the response. *Gerber Third Supplemental Resp.* at 2 (Dec. 23, 2002) (Confidential Admin. R.

Doc. No. 42); *Redetermination* at 14.

        The evidence of record is also sufficient to support the Department's conclusion that

Green Fresh withheld some information and impeded the investigation significantly through its

misleading and incorrect questionnaire responses.  Section A of the Department's questionnaire

required Green Fresh to identify unaffiliated companies "that supplied [Green Fresh] with the

merchandise under review that [its] company or an affiliate sold to the United States." *Green

Fresh Section A Resp.* at 11 (May 23, 2002) (Confidential Admin. R. Doc. No. 1) (quoting *Green

Fresh Section A Questionnaire* at A-8 (Apr. 16, 2002)); *Redetermination* at 10.  In its response

submitted on May 24, 2002, Green Fresh stated, falsely, that Gerber supplied Green Fresh with

merchandise to be exported to the United States. *Green Fresh Section A Resp.* at 11 (May 23,

2002) (Confidential Admin. R. Doc. No. 1); *Redetermination* at 10.  In the same response, Green

Fresh told Commerce that it acted as an agent for sales made by Gerber and that "Gerber had full

knowledge at all times that this merchandise was destined for the United States as Gerber

negotiated the sale with its customer in the United States." *Green Fresh Section A Resp.* at 11

(May 23, 2002) (Confidential Admin. R. Doc. No. 1); *Redetermination* at 10.  In its response to

Section C of the Commerce questionnaire, Green Fresh falsely stated that "[t]he subject

merchandise sold by Green Fresh was produced by Lubao, [Green Fresh's] affiliated

manufacturer, and Gerber, an unaffiliated manufacturer." *Green Fresh Section C and D Resp.*

at C26 (June 7, 2002) (Confidential Admin. R. Doc. No. 6); *Redetermination* at 18.  Green Fresh

then indicated: "We have reported in our sales listing all sales of Lubao's merchandise.  The

sales of Gerber me[r]chandise are listed in the sales listing submitted as part of Gerber's response

and are indicated by all invoices that begin with the prefix LX." *Green Fresh Section C and D*

*Resp.* at C26 (June 7, 2002) (Confidential Admin. R. Doc. No. 6); *Redetermination* at 18.

  As it had in requesting information from Gerber, Commerce asked Green Fresh, in a first

supplemental questionnaire sent on July 23, 2002, to discuss the function that Green Fresh had

performed with respect to Gerber's merchandise.  In its response, Green Fresh stated, again

falsely, that it had acted as the exporter for sales in which Gerber was the manufacturer.  *See*

*Green Fresh First Supplemental Resp.* at 1 (Aug. 19, 2002) (Confidential Admin. R. Doc.

No. 21); *Redetermination* at 10.  Somewhat inconsistently with this statement, the same response

stated that "[t]he subject merchandise produced by Gerber was not transported to either Green

Fresh's or Lubao's premises before being transported to the United States." *Green Fresh First*

*Supplemental Resp.* at 1 (Aug. 19, 2002) (Confidential Admin. R. Doc. No. 21); *Redetermination*

at 10.  In the supplemental questionnaire, Commerce, noting that Green Fresh had listed only its

sales of Lubao's merchandise in an exhibit (Exhibit C-2) to its Section C response listing its

sales, asked Green Fresh to "explain why you did not list any sales of Gerber merchandise in

Exhibit C-2?" *Green Fresh First Supplemental Questionnaire* at 8 (July 23, 2002) (Confidential

Admin. R. Doc. No. 11); *Redetermination* at 18.  Green Fresh responded that "[s]ince Gerber is

also a respondent in this investigation, we believed that Gerber would report those sales.  We

have now revised Exhibit C-2 so as to include all the Gerber merchandise as well." *Green Fresh*

*First Supplemental Resp.* at 13 (Aug. 19, 2002) (Confidential Admin. R. Doc. No. 21);

*Redetermination* at 18.  The question provided Green Fresh the opportunity to provide

Commerce the correct answer by stating unequivocally that Green Fresh had made no sales of

Gerber's merchandise during the review.  Green Fresh did not do so.

Commerce responded with a further inquiry in a second supplemental questionnaire,

asking Green Fresh to "[p]lease provide a detailed description of the roles that [Gerber] and

Green Fresh played with regard to the sales of subject merchandise manufactured by Gerber but

sold by Green Fresh ('sales in question')." *Green Fresh Second Supplemental Questionnaire* at 1

(Nov. 22, 2002) (Confidential Admin. R. Doc. No. 36); *Redetermination* at 12.  In its response,

Green Fresh stated that "Green Fresh acted as Gerber's shipping agent by providing Gerber with

certain export documents (an invoice, Customs and Quarantine inspection form, packing list,

VAT refund form, Chinese customs declaration).  Gerber was the manufacturer and seller for all

these sales, meaning that Gerber sold to its own customers, not Green Fresh's customers, and

Gerber negotiated the price." *Green Fresh Second Supplemental Resp.* at 1 (Dec. 23, 2002)

(Confidential Admin. R. Doc. No. 43); *Redetermination* at 12.  In the same questionnaire,

Commerce referred to the revised Exhibit C-2 that Green Fresh had provided to Commerce when

responding to the previous supplemental questionnaire, noting that Green Fresh had reported

eleven sales transactions "which Green Fresh claims to represent sales supplied by Gerber that

were sold through Green Fresh to the United States ('Gerber sales')." *Green Fresh Second*

*Supplemental Questionnaire* at 3 (Nov. 22, 2002) (Confidential Admin. R. Doc. No. 36);

*Redetermination* at 19.  Green Fresh responded that "[w]e reported the 11 sales transactions for

which we had the data.  Since our role was limited to providing export documents, we were not

aware of the details of all of the transactions." *Green Fresh Second Supplemental Resp.* at 3

(Dec. 23, 2002) (Confidential Admin. R. Doc. No. 43); *Redetermination* at 19.  In contrast to

Green Fresh's earlier questionnaire responses, Green Fresh's December 23, 2002 response finally

provided information from which Commerce could conclude that the eleven sales transactions

were not, in any respect, sales that belonged to Green Fresh for purposes of the administrative

review.

        The record evidence summarized above supports the Department's finding that Gerber

and Green Fresh withheld information material to the determination and calculation of

antidumping duty assessment rates for sales of Gerber's merchandise.  In some of the responses

to the Department's questionnaires, for example, each party failed to disclose that Gerber, and

not Green Fresh, was the actual exporter in all sales transactions involving Gerber's merchandise

that were involved in the review.  Rather than plainly disclosing that fact, some responses of both

parties provided confusing and contradictory information that misled Commerce to believe that

Green Fresh had performed some function related to the sale of Gerber's merchandise, when in

fact Green Fresh did not.  Other responses failed to inform Commerce of the plain fact that

Gerber was never a supplier of subject merchandise to Green Fresh during the period of review.

        Substantial evidence also supports the Department's finding that each plaintiff

significantly impeded the administrative review in providing responses relevant to the issue of

the identity of the exporter and seller in certain of the transactions that were involved in the

administrative review.  Various of those responses were confusing, misleading, and evasive;

some of them, as discussed previously, were actually false.  Most of the responses at issue were

unsatisfactory in one respect or another in providing Commerce with the actual facts concerning

the identity of the exporter and seller for certain of the sales transactions of subject merchandise.

The Department's questions throughout the series of supplemental questionnaires to both parties

indicate that Commerce misinterpreted, quite reasonably, the initial responses of Gerber and

Green Fresh so as to presume that Green Fresh actually exported some of the merchandise

produced by Gerber and that Green Fresh had some role in the sale of Gerber's merchandise.

Neither party confined their inadequate responses to the initial questionnaires.  Each party had

the opportunity, in responding to the inquiries in the first supplemental questionnaires, to clarify

that Gerber never provided Green Fresh with subject merchandise during the review, that Green

Fresh did not export any of Gerber's product to the United States, and that Green Fresh never

took title to, or had any other role in, the sale of Gerber's merchandise.  Neither party did so.

Instead, both Gerber and Green Fresh provided confusing and contradictory information in

response to the first supplemental questionnaire.  The record consisting of the questionnaires and

the responses, when viewed as a whole, supports a finding that Commerce was caused by the

deficient responses to direct significant time and resources to acquire information that the parties

were obligated by statute and regulation to disclose at a much earlier point in the process.

> B.  The Department's Determination that Each Plaintiff Failed to Cooperate by Not Acting to the
> Best of Its Ability to Comply with a Request for Information Is Adequately Supported by
> Findings and Record Evidence

If Commerce "finds that an interested party has failed to cooperate by not acting to the

best of its ability to comply with a request for information[,]" Commerce, "in reaching the

applicable determination . . . may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  The statutory

obligation to act to the best of its ability in complying with the agency's information request

"requires the respondent to do the maximum it is able to do."  *Nippon Steel Corp. v. United*

*States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "Compliance with the 'best of its ability' standard

is determined by assessing whether respondent has put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries in an investigation." *Id.*

Commerce made separate findings that Gerber and Green Fresh, for purposes of

19 U.S.C. § 1677e(b), failed to act to the best of their respective abilities in complying with the

Department's requests for information.  These findings are supported by substantial evidence and

satisfactorily explained in the Redetermination.  *See Redetermination* at 37-41.  The responses of

Gerber and Green Fresh to the Department's information requests fell far short of the standard

imposed by § 1677e(b) even after Commerce, as required under § 1677m(d), provided both

parties with the opportunity to remedy the deficiencies.  Each plaintiff provided some responses

that were misleading, evasive, or false with respect to the identity of the exporter and seller for

some of the transactions in the review.  They had the obligation to act to the best of their

respective abilities in informing Commerce of the actual facts pertaining to those transactions.

Rather than provide confusing, contradictory, and false responses, the parties should have

communicated, clearly and unequivocally, and without delay, the materials facts, *e.g.*, that Gerber

did not supply subject merchandise to Green Fresh, that Gerber exported all of its own subject

merchandise that was sold in the United States during the period of review, and that Green Fresh

had no role in the sale of that merchandise.

Gerber implied or explicitly stated to Commerce that Green Fresh exported Gerber's

merchandise and had a role in the sale of that merchandise, even after Commerce provided

Gerber with the opportunity, as required under § 1677m(d), to remedy inaccurate, confusing, or

otherwise deficient information.  While Gerber, in its third supplemental response, provided a

more accurate and comprehensive account regarding the execution of the twenty-four

transactions at issue, even that response stated that Green Fresh would "amend[] its sales listing

to reflect a total of 24 sales made on behalf of Gerber[.]"  *Gerber Third Supplemental Resp.* at 2

(Dec. 23, 2002) (Confidential Admin. R. Doc. No. 42).  Throughout the administrative review,

from the initial Section A response to the third supplemental response, Gerber provided

confusing, incomplete, and inaccurate responses.

      With respect to Green Fresh, substantial record evidence also supports the Department's

finding that Green Fresh did not act to the best of its ability to comply with the information

requests of Commerce.  Throughout the questionnaire responses, Green Fresh continued to

provide contradictory information that it was a sales agent for Gerber or an exporter of Gerber's

merchandise.  Only in its response to the second supplemental questionnaire did Green Fresh

provide a detailed response indicating its limited role in providing Gerber with certain export

documents.  *Green Fresh Second Supplemental Resp.* at 1 (Dec. 23, 2002) (Confidential Admin.

R. Doc. No. 43); *see Redetermination* at 12.  Even in its responses to that questionnaire,

however, Green Fresh continued to report eleven transactions that it purportedly made on behalf

of Gerber.  *Green Fresh Second Supplemental Resp.* at 3 (Dec. 23, 2002) (Confidential Admin.

R. Doc. No. 43).  The record discloses that those transactions involved merchandise produced,

sold, and exported by Gerber.

      As quoted and cited above in the discussion of the application of the "facts otherwise

available" provision, Gerber and Green Fresh placed contradictory and confusing information on

the record throughout the investigation.  As *Gerber I* explained, the participation of the

respondents in the export agency arrangement is not sufficient, by itself, to justify the application

of the adverse inference provision in § 1677e(b) with respect to all of the specific information

needed to calculate individual assessment rates.  *See Gerber I*, 29 CIT at __, 387 F. Supp. 2d at

1282-84.  Nonetheless, each party was required to act to the best of its ability in supplying

Commerce with the facts necessary to the determination and calculation of antidumping duty

assessment rates, which includes the pertinent facts underlying the transactions involved in the

review.  Gerber and Green Fresh had the obligation, and multiple opportunities, to disclose the

actual facts about Green Fresh's limited role in certain transactions involving Gerber's

merchandise, but they failed to do so.

> ### C.  The Selection of Facts Otherwise Available and the Application of Adverse Inferences to Twenty-Four Sales Transactions

Commerce relied on the facts otherwise available and adverse inferences provisions in

determining an antidumping duty rate for the twenty-four transactions for which Commerce

determined that Gerber obtained the benefit of Green Fresh's cash deposit rate in entering subject

merchandise.  Commerce included those twenty-four transactions in its calculation of individual

assessment rates both for Gerber and for Green Fresh.  Substantial record evidence and a

reasoned explanation support the determination by Commerce to attribute those transactions to

Gerber.  Commerce, however, failed to support with substantial record evidence and also failed

to explain adequately its reasoning for attributing to Green Fresh those same twenty-four

transactions.  As noted previously, Commerce determined Gerber to be the producer, seller, and

exporter on those transactions.

In selecting from among facts otherwise available, Commerce may rely on information

derived from any information placed on the record of the administrative review.  19 U.S.C.

§ 1677e(b).  The Court of Appeals for the Federal Circuit has noted that "in the case of an

uncooperative respondent, Commerce is in the best position, based on its expert knowledge of

the market and the individual respondent, to select adverse facts that will create the proper

deterrent to noncooperation with its investigations and assure a reasonable margin." *F.LLI De*

*Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

("*De Cecco*").  However, as the Court of Appeals signaled in its reference to "a reasonable

margin," the Department's discretion to choose from among the facts otherwise available is not

unlimited.  *Id.* (noting the intention of Congress that Commerce not "overreach reality" in

applying § 1677e(a) and (b)).

   1.  Commerce Did Not Exceed Its Authority in Applying the Facts Otherwise Available and
      Adverse Inferences Provisions to Twenty-Four of Gerber's Thirty-Four Sales Transactions

        The record evidence, summarized previously, supports the findings that Gerber withheld

information, significantly impeded the review proceeding, and did not act to the best of its ability

in responding to the Department's requests for information pertaining to the identity of the

exporter and seller on certain transactions.  Even in its response to the Department's inquiry in

the third, and final, supplemental questionnaire, after multiple opportunities to correct and

supplement its responses to the original questionnaire, Gerber's responses to Commerce were not

entirely satisfactory.  As discussed above, Commerce asked Gerber in the third supplemental

questionnaire to describe the respective roles of Gerber and Green Fresh in sales involving

merchandise that was produced by Gerber but sold by Green Fresh.  *Gerber Third Supplemental*

*Questionnaire* at 2 (Nov. 22, 2002) (Confidential Admin. R. Doc. No. 37); *Redetermination*

at 13.  Gerber unsatisfactorily responded that twenty-four of its total of thirty-four transactions

"were made through Green Fresh" and that "[w]e have conferred with Green Fresh and learned

that they mistakenly did not report all of the sales made by it on our behalf." *Gerber Third*

*Supplemental Resp.* at 2 (Dec. 23, 2002) (Confidential Admin. R. Doc. No. 42); *Redetermination*

at 13-14. Gerber further misinformed Commerce that Green Fresh was amending its sales listing

to "reflect a total of 24 sales made on behalf of Gerber in response to their latest questionnaire."

*Gerber Third Supplemental Resp.* at 2 (Dec. 23, 2002) (Confidential Admin. R. Doc. No. 42);

*Redetermination* at 13-14. These inaccurate responses demonstrate that Gerber, even at the

conclusion of the questionnaire process, was incorrectly indicating to Commerce that the twenty-

four transactions in question were, in some respect, Green Fresh's sales transactions.

Commerce invoked the facts otherwise available and adverse inference provisions with

respect to those twenty-four sales transactions, assigning the transactions the rate of 198.63

percent; Commerce used the actual, transaction-specific information for the remaining ten

transactions. The court concludes that except for the assignment of the 198.63 percent rate, the

Department's decision to do so was in accordance with law. Under 19 U.S.C. § 1677m(d),

Commerce had the authority to "disregard all or part of the original and subsequent responses"

and thereby treat the submitted information about the identity of the exporter and seller for those

twenty-four transactions as information subject to the facts otherwise available and adverse

inference provisions. Commerce was within its authority in concluding that because Gerber had

not acted to the best of its ability in responding to particular information requests involving those

twenty-four transactions, Gerber was not entitled to the benefit of § 1677m(e), under which

Commerce is precluded from disregarding information that satisfies all criteria of § 1677m(e).

### 2.  Commerce Has Not Justified the Assignment to Green Fresh of the Twenty-Four Sales Transactions Made by Gerber

The record evidence summarized previously also supports the findings by Commerce that Green Fresh withheld information, significantly impeded the review proceeding, and did not act to the best of its ability by providing unsatisfactory responses to the Department's information requests pertaining to the identity of the exporter and seller on some transactions involved in the administrative review.  Those, however, were Gerber's, not Green Fresh's, transactions.  The Redetermination does not present evidentiary support or adequate reasoning for attributing the same twenty-four transactions to two parties, *i.e.*, to both Gerber and to Green Fresh, despite the finding that Gerber was the producer, seller, and exporter of the merchandise involved.

In the Redetermination, Commerce stated the following as reasoning for assigning the twenty-four transactions to Green Fresh:

> [t]he 22 customs entry summaries Green Fresh provided in its August 20, 2002, 1st supplemental response for these 24 transactions (of which Gerber reported all 24 but Green Fresh only reported 11 to the Department) contain a Green Fresh manufacturer identification code (for 12 of them) or a Gerber manufacturer identification code (for the remaining 10).  In either case, all 22 customs entry summaries indicate that Green Fresh's cash deposit rate, rather than Gerber's, was used to post the antidumping duties for these sales at issue.

*Redetermination* at 50 (footnotes omitted).  The documentation cited by Commerce in the above-quoted segment of the Redetermination does not constitute evidence supporting the Department's finding that it was appropriate to assign all, or any, of the twenty-four transactions to Green Fresh.

As Commerce found according to the record evidence, Gerber was the importer of record for the merchandise on all twenty-four transactions and therefore was responsible for preparing

all entry documentation submitted to Customs, including the listing of the manufacturer code.

*See id.* at 29-30.  The entry documentation prepared by Gerber identifies Green Fresh as the

manufacturer for only twelve of the twenty-two entries.  *See Green Fresh First Supplemental*

*Resp.*, Ex. AS1 (Aug. 19, 2002) (Confidential Admin. R. Doc. No. 21).  The evidence cited by

Commerce links to Gerber, the importer of record, the act of setting forth Green Fresh as the

exporter for all twenty-two entries, but that same evidence does not support necessarily a finding

that Green Fresh participated in, or assisted in, the entry process.  Moreover, even if that

particular evidence had supported such a finding, the finding is not relevant to the determination

and calculation of the assessment rate for Green Fresh's transactions in the administrative

review, which solely involved the exportation to the United States of merchandise produced by

Lubao.  Nor is it dispositive that Green Fresh, upon a request from Commerce in the first

supplemental questionnaire, obtained from Gerber the twenty-two entry summaries and

submitted them to Commerce as part of Green Fresh's response.  *See id.*

   The shortcomings in the Department's rationale for attributing, under the authority of

19 U.S.C. § 1677e, the twenty-four transactions to Green Fresh are readily apparent when

compared to the application by Commerce of § 1677e in determining an overall assessment rate

for Gerber.  The record establishes that Gerber withheld information needed to calculate the

antidumping duty liability on the entries corresponding to the twenty-four sales transactions.  *See*

*Redetermination* at 8-22, 28, 31-32.  The record also reveals that Gerber impeded the review

proceeding by providing questionnaire responses that were evasive, misleading, and, in some

instances, false with respect to those same facts.  *See id.*  The facts to which the Department's

access was impeded were that Gerber never supplied Green Fresh with subject merchandise

during the period of the third administrative review, that Gerber, not Green Fresh, exported the

merchandise on the twenty-four sales transactions, and that Green Fresh had no role in

conducting those transactions.  On those record facts, Commerce had authority under § 1677e to

regard the identity of the actual exporter as a factual matter on which it could invoke the facts

otherwise available provision.  Green Fresh appears to have hindered the Department in

determining those same facts; however, those facts did not pertain to the determination of

antidumping duty liability for any of Green Fresh's 134 transactions during the administrative

review.  In this respect, substantial record evidence has not been presented to support a finding

that any or all of the twenty-four transactions of Gerber should be attributed to Green Fresh.

Although "it is within Commerce's discretion to choose which sources and facts it will rely on to

support an adverse inference when a respondent has been shown to be uncooperative[,]" that

discretion, as discussed above, is subject to limitations.  *De Cecco*, 216 F.3d at 1032.  Commerce

must rely on those sources and facts that "assure a reasonable margin[,]" a margin that is "a

reasonably accurate estimate of the respondent's actual rate[.]"  *Id.*  Because the twenty-four

transactions involved merchandise produced and exported by Gerber and because Green Fresh

had no role in the sale of that merchandise, the overall assessment rate Commerce calculated for

Green Fresh in the Redetermination, which was based in part on those twenty-four transactions,

does not appear to be "reasonable" or have a "basis in reality."  *See id.* at 1034.

　　　　As it did in the Final Results, the Department's justification in the Redetermination for

invoking facts otherwise available and adverse inferences as to Green Fresh rests principally on

disapproval of what Commerce found to be Green Fresh's role in the export agency agreement.

*See Redetermination* at 34 (concluding that "Green Fresh's very participation in this 'agent' sales

scheme further impeded our ability to conduct this administrative review and 'impose'

antidumping duties pursuant to Section 731 of the Act.").  The Department invoked its "inherent

authority to protect the integrity of its proceedings" and submitted that not invoking 19 U.S.C.

§ 1677e "would amount to condoning the circumvention of the antidumping duty law in this

administrative proceeding."  *Id.* at 41.  In this respect, the Department's rationale for invoking

§ 1677e as to Green Fresh essentially amounts to punishment for engaging in the export agency

agreement, which Commerce found to have allowed the entry of Gerber's merchandise under an

improperly low cash deposit.  The authority provided by 19 U.S.C. § 1677e, however, is not

properly invoked as an alternative to civil penalty authority over acts and omissions arising from

the entry process.[4]

### D.  Commerce Exceeded Its Authority in Assigning the Assessment Rate of 198.63 Percent to the Twenty-Four Sales Transactions

Commerce, in the Redetermination, recalculated the assessment rates for Gerber and

Green Fresh by taking the weighted average of the 198.63 percent rate applied to the twenty-four

transactions at issue and of the duty rate based on the verified information submitted by plaintiffs

for the other ten transactions of Gerber and for the 134 transactions that actually were conducted

by Green Fresh.  *See Redetermination* at 6, 49-50.  In *Gerber I*, the court found that Commerce

failed to support with substantial record evidence its determination to apply the 198.63 percent

rate to Gerber's and Green Fresh's transactions.  *See* 29 CIT at __, 387 F. Supp. 2d at 1284-88.

---

[4] Without implying any findings of fact or conclusions of law specific to this proceeding, the court observes that if the United States believes it can develop facts demonstrating that any party importing merchandise evaded cash deposit requirements, or facts demonstrating that any party aided and abetted an importer in doing so, civil penalty authority exists under which the United States could pursue the matter.  *See* 19 U.S.C. § 1592(a) (2000).

The court concluded that Commerce failed to explain how the 198.63 percent rate was rationally

related to the facts underlying the calculation of either Gerber's or Green Fresh's actual dumping

margin.  *Id.*  Defendant insists that the application of the 198.63 percent rate to these twenty-four

transactions, with respect to both Gerber and Green Fresh, bears a rational relationship to the

information submitted and is not impermissibly punitive.  *See* Def.'s Resp. 24-28.  The

narrowing by Commerce of the application of the rate from all of Gerber's and Green Fresh's

transactions to a portion consisting of twenty-four transactions conducted by Gerber does not

establish a rational relationship between the 198.63 percent rate and the transaction-specific

margins of Gerber or of Green Fresh.

      In selecting from among "facts otherwise available," Commerce may rely on information

derived from the following sources: "the petition"; "a final determination in the investigation

under this subtitle"; "any previous review under [19 U.S.C. § 1675] or determination under

[19 U.S.C. § 1675b]"; or "any other information placed on the record." 19 U.S.C. § 1677e(b).

As the court noted in *Gerber I*, "[s]ubsection (b) of § 1677e cannot properly be read in isolation."

*Gerber I*, 29 CIT at __, 387 F. Supp. 2d at 1284.  The court explained that

> an assessment rate, standing alone, is not a "fact" or a set of "facts otherwise
> available," and under no reasonable construction of the provision could it be so
> interpreted.  The statute does not permit Commerce to choose an antidumping
> duty assessment rate as an "adverse inference" without making factual findings,
> supported by substantial evidence . . . .

*Id.* at 1285.

      The statute requires Commerce to select an antidumping duty rate that is "a reasonably

accurate estimate of the respondent's actual rate[.]"  *De Cecco*, 216 F.3d at 1032.  As the Court

of Appeals explained, "the purpose of section 1677e(b) is to provide respondents with an

incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *Id.*

"Particularly in the case of an uncooperative respondent, Commerce is in the best position, based

on its expert knowledge of the market and the individual respondent, to select adverse facts that

will create the proper deterrent to noncooperation with its investigations and assure a reasonable

margin." *Id.* Nonetheless, as discussed in Part C above, the Department's discretion in selecting

from among the facts otherwise available is not without limit. *Id.* Congress, in amending

§ 1677e, did so to "block any temptation by Commerce to overreach reality in seeking to

maximize deterrence." *Id.* (explaining that the imposition by Congress of the corroboration

requirement in 19 U.S.C. § 1677e(c) indicates the intention of Congress to temper deterrence and

ensure that Commerce not "overreach reality" in applying § 1677e(a) and (b)). While Commerce

may rely on a "rate with an eye toward deterrence, Commerce acts within its discretion so long as

the rate chosen has a relationship to the actual sales information available." *Ta Chen Stainless*

*Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (explaining that

Commerce acted within its discretion in selecting a 30.95 percent antidumping duty rate because

that rate fell within the range of the respondent's actual sales data). In other words, the statute

"requires that an assigned rate relate to the [respondent] to which it is assigned." *Shandong*

*Huarong Gen. Group Corp. v. United States*, 29 CIT at __, Slip Op. 05-129 at 11 (Sept. 27,

2005). Commerce, in applying the 198.63 percent rate to Gerber and to Green Fresh in the

Redetermination, did not explain adequately the relationship of the 198.63 percent rate to the

record evidence pertaining to Gerber and to Green Fresh. To the contrary, the facts Commerce

found do not support the application of the 198.63 percent assessment rate, which was calculated

based on information in the petition and the presumption of government control of respondents.

*See Final Results*, 68 Fed. Reg. at 41,307-08; *Notice of Final Determination of Sales at Less*

*Than Fair Value: Certain Preserved Mushrooms from the People's Republic of China*, 63 Fed.

Reg. 72,255, 72,256-57 (Dec. 31, 1998) ("*Final Determination*"); *Initiation of Antidumping*

*Investigations: Certain Preserved Mushrooms From Chile, India, Indonesia, and the People's*

*Republic of China*, 63 Fed. Reg. 5360, 5363 (Feb. 2, 1998) ("*Notice of Initiation*").

Commerce, in the notice of initiation, set forth the petition as the source of the

198.63 percent China-wide rate. *Notice of Initiation*, 63 Fed. Reg. at 5363. Commerce

explained that the petitioners selected thirty-six potential exporters and producers from China

and calculated an estimated antidumping duty margin ranging from 85.38 to 198.63 percent

based on petitioners' estimates of export price and normal value. *Id.* (stating that petitioners

calculated export value from average Customs import values and U.S. price quotes, and that they

derived the normal value from surrogate values that they based on Indian factors-of-production

data). Commerce did not explain the difference between the low end and the high end of the

range. Commerce did note, however, that China is considered a nonmarket economy under

19 U.S.C. § 1677(18). *Id.* In the final determination of the investigation, Commerce concluded

that because of the discrepancy in quantity and value of mushroom imports reported in U.S.

import statistics and those reported by all PRC exporter respondents, Commerce was "applying a

single antidumping deposit rate—the PRC-wide rate—to all exporters in the PRC . . . based on

[the Department's] presumption that the export activities of the companies that failed to respond

to the Department's questionnaire are controlled by the PRC government." *Final Determination*,

63 Fed. Reg. at 72,257 (internal citation omitted). Commerce then selected as the China-wide

rate the highest rate in the petition, 198.63 percent, explaining that "[a]s adverse facts available,

we are assigning the highest margin in the petition, 198.63 percent, because the margins in the

petition (as recalculated by the Department at initiation) were higher than any of the calculated

margins." *Id.*

In the Preliminary Results of the administrative review at issue, Commerce affirmed that

"[i]n proceedings involving NME countries, the Department begins with a rebuttable

presumption that all companies within the country are subject to government control and thus

should be assessed a single antidumping duty deposit rate (*i.e.*, a PRC-wide rate)." *Preliminary*

*Results*, 68 Fed. Reg. at 10,698.  Commerce, however, found that both Gerber and Green Fresh

are free of government control.  *Preliminary Results*, 68 Fed. Reg. at 10,698-99; *see Final*

*Results*, 68 Fed. Reg. at 41,306-07 & 41,306 n.7; *Redetermination* at 53-54.  As the court noted

in *Gerber I*, "Commerce acts unlawfully in imposing a rate that presumes government control,

such as the PRC-wide rate applied in this case, when a respondent has been found to be

independent of government control."  *Gerber I*, 29 CIT at __, 387 F. Supp. 2d at 1287.

In explaining its continued use of the 198.63 percent antidumping duty rate, Commerce

contends that the practice of the Department of assigning the highest rate on record, as the rate

most adverse to respondents, is consistent with 19 U.S.C. § 1677e and precedent.

*Redetermination* at 51-54.  Commerce explains that it selected the 198.63 percent antidumping

duty rate based on the information in the petition as permitted under 19 U.S.C. § 1677e(b).  *Id.*

at 53.  Commerce insists that precluding Commerce from using the highest rate would vitiate the

agency's ability to deter circumvention of the antidumping duty law and to induce respondents to

cooperate.  *Id.* at 51-54.  Commerce argues that "[a]pplying the highest rate is consistent with the

Department's practice, and ensures that the margin is sufficiently adverse as to effectuate the

purpose of the facts available rule to induce a respondent to provide the Department with

complete and accurate information in a timely manner." *Id.* at 53 (internal quotation marks and

citation omitted).  Commerce maintains that "the Court's concerns about Gerber's and Green

Fresh's rights to a separate rate are not at issue[,]" explaining that "the Department has

determined that Gerber and Green Fresh warrant separate-rate treatment in this case." *Id.* at 54.

Defendant-Intervenor adds that "in [non-market economy] cases, the country-wide [antidumping

duty] rate is *not* exclusive to government-controlled exporters" and that "[i]t is instead exclusive

to all non-cooperative exporters, government-controlled or not."  Def.-Intervenor's Reply 13.

Defendant-Intervenor characterizes the application of "partial adverse facts available" to the

twenty-four transactions of Gerber as "appropriate . . . for any uncooperative exporter . . .

regardless of whether or not the exporter is controlled by its government." *Id.* at 13-14.

Commerce, however, has not explained adequately, with respect to government control or

otherwise, how the highest rate in the petition might bear a rational relationship to the actual

margin of Gerber or of Green Fresh.  *See De Cecco*, 216 F.3d at 1032 (rejecting the application

of the petition rate after "the court found that there was 'nothing to support' an inference that the

petition rate might reflect [the respondent's] actual dumping margin." (internal quotation marks

and citation omitted)).

The court cannot sustain the application by Commerce of the 198.63 percent rate given

the Department's failure to explain how that rate has an actual relationship to the sales

information available for either respondent or how that rate is a reasonably accurate estimate of

either respondent's actual antidumping duty assessment rate with some built-in increase to deter

noncompliance.  To the contrary, the record evidence shows that the 198.63 percent rate is

unrelated to the factual bases underlying the calculation of assessment rates for the two

respondents and is many times higher than each respondent's actual dumping margin.  Even

accounting for some built-in increase intended as a deterrent to non-compliance, the rate selected

by Commerce pursuant to its adverse inference authority is not a reasonably accurate estimate of

the respondent's actual rate.  *See id.* (rejecting a rate resulting from the application of § 1677e

that was many times higher than the actual rate for the respondent, a high-end producer, and

explaining that the rate was not relevant given the facts that the applied rate was higher than

respondent's actual rate, higher than the rates of other similarly situated high-end producer

respondents, and higher than the rates of low-end producer respondents).  Yet Commerce insists

that it can disregard the parties' transaction-specific information and select, as adverse

inferences, facts that have no rational relationship to either respondents' sales data.  Defendant

and defendant-intervenor would have the court ignore binding precedent and affirm Commerce in

selecting the highest possible rate to maximize deterrence, regardless of the degree to which that

rate "overreach[es] reality."  *See id.*  The court declines to do so and therefore will not uphold the

determination by Commerce to apply the highest possible rate of 198.63 percent to the

twenty-four transactions at issue.

Commerce, in the Redetermination, states that "[it] assumes that if respondents had

received a rate lower than the highest prior margin, they would not have cooperated, and the

Court of Appeals for the Federal Circuit has long recognized that assumption to be reasonable."

*Redetermination* at 52.  Commerce relies primarily on *Rhone Poulenc, Inc. v. United States*,

899 F.2d 1185, 1190-91 (Fed. Cir. 1990) to support this assumption.  *See id.  Rhone Poulenc*,

however, involved the application of the "best information available" standard under 19 U.S.C.

§ 1677e prior to the substantial amendment of that statutory provision by the Uruguay Round

Agreements Act, Pub. L. No. 103-465, § 231(c), 108 Stat. 4809, 4896-97 (1994) ("URAA").  *See*

*Rhone Poulenc, Inc.*, 899 F.2d at 1189-91; *see also Uruguay Round Agreements Act, Statement*

*of Administrative Action*, H.R. Doc. No. 103-316, at 869-70 (1994), *as reprinted in* 1994

U.S.C.C.A.N. 4040, 4198-99.  In the URAA, Congress changed the language from "best

information available" to "facts otherwise available" and "adverse inferences" and, most

significantly, directed Commerce to make additional findings to justify the application of those

new provisions.  *Compare* 19 U.S.C. § 1677e(c) (1988) (stating that "[i]n making [its]

determinations under [Subtitle IV - Countervailing and Antidumping Duties], the administering

authority . . . shall, whenever a party or any other person refuses or is unable to produce

information requested in a timely manner and in the form required, or otherwise significantly

impedes an investigation, use the best information otherwise available.") *with* 19 U.S.C.

§ 1677e(a)-(b) (2000) (directing Commerce to make specific factual findings to justify separately

the application of facts otherwise available and adverse inferences and subjecting such findings

to further requirements set forth in 19 U.S.C. § 1677m(d)-(e) (2000)).

Commerce also cites *Kompass Food Trading International v. United States*, 24 CIT 678

(2000), as support for its use of the 198.63 percent rate.  *See Redetermination* at 52.  *Kompass*

*Food*, a decision of the Court of International Trade affirming the application of facts otherwise

available and adverse inferences, is readily distinguished from the case before the court.  In

applying the facts otherwise available and adverse inferences provisions under 19 U.S.C.

§ 1677e, the Court in *Kompass Food* affirmed the Department's determination because

Commerce found that the pro se respondent provided no response to the Department's

questionnaires. *Id.* at 680-81.  The Court explained that in the absence of any sales information

for respondent, Commerce had no facts to indicate respondent's actual margin.  *See id.* at 682-84.

The Court in *Kompass Food* therefore concluded that "Commerce used a properly calculated

margin[,]" explaining that Commerce selected a margin that was calculated for a fully

cooperative respondent in the original investigation and that the respondent selected was

representative of the domestic industry.  *Id.* at 683 n.6.  In this case, Commerce had sufficient

information to calculate transaction-specific assessment rates.  The respondents provided that

information, Commerce itself verified the information and concluded it was accurate and

adequate for purposes of calculating individual assessment rates for both respondents, and

Commerce calculated individual assessment rates for both respondents in the Preliminary

Results.  *See Preliminary Results*, 68 Fed. Reg. at 10,698-99.  Commerce therefore had actual

sales information to serve as points of comparison in determining whether the rate selected as an

inference adverse to respondents is rationally related to their actual margin.  Moreover, in

contrast to the factual record in *Kompass Food*, the rate selected in this case was not specific to a

respondent in a prior review that was found to be representative of the domestic industry and

instead was derived from information set forth in the petition.  As stated above, unsupported

assertions that the selected rate is probative and corroborated do not suffice.

     Defendant also argues that the holding in *Shanghai Taoen International Trading Co. v.*

*United States*, 29 CIT __, 360 F. Supp. 2d 1339 (2005), is sufficiently similar to indicate that the

application of the 198.63 percent rate to Gerber and to Green Fresh is not impermissibly punitive.

Def.'s Resp. 27-28.  Defendant explains that the case involved a similar fact pattern, in which

"what was reported and verified by Commerce differed from what was reported and relied upon

by Customs," and that the Court found that Commerce was correct to apply "adverse facts

available" and did not do so in a punitive manner.  *Id.*  Defendant states that given precedent and

the amendment of the statute with the addition of 19 U.S.C. § 1677e(a) and (b), the application of

"partial adverse facts available" is not punitive in this case.  *Id.*  Defendant-intervenor echoes

defendant's argument that the court should affirm the Redetermination because the findings of

Commerce are similar to the redetermination that was affirmed by the Court in *Shanghai Taoen*,

29 CIT __, 360 F. Supp. 2d 1339.  Def.-Intervenor's Reply 15-16.  Defendant-intervenor also

argues that as in *Shanghai Taoen*, Gerber and Green Fresh "attempted to present different facts

concerning the same entries to the same two federal agencies - Commerce and Customs" and that

"the discovery of the schemes resulted in the respondents' dramatic loss of credibility before

Commerce."  *Id.* at 16.

        The court is unpersuaded by defendant's and defendant-intervenor's arguments.  In

*Shanghai Taoen*, the Court "sustain[ed] Commerce's determination that [the respondent] failed

to provide accurate producer information" throughout the administrative review and held that

"Commerce was justified in applying total facts otherwise available under § 1677e."  *Shanghai*

*Taoen*, 29 CIT at __, 360 F. Supp. 2d at 1345.  The Court affirmed the assignment by Commerce

of the highest rate determined in the proceedings, which was 223.01 percent, a rate calculated in

a prior administrative review for one of the exporter respondents.  *Id.* at 1342, 1345.  The Court

found adequate the Department's explanation "that the rate is relevant because it is 'based on

sales and production data of a respondent in a prior review,' it is 'subject to comment from

interested parties in the proceeding,' and there is 'no information on the record of this review that

demonstrates that this rate is not appropriately used as adverse facts available.'"  *Id.* at 1347

(quoting an intra-agency memorandum of Commerce).  The Court concluded that the highest rate

on the record was "rationally related" to the respondent because "the rate reflect[ed] recent

commercial activity by a [respondent] exporter from the PRC," and because the "[respondent's]

failure to accurately respond to Commerce's producer questions ha[d] resulted in an egregious

lack of evidence on the record to suggest an alternative rate."  *Id.* at 1348.  In contrast to

*Shanghai Taoen*, the 198.63 percent rate selected in this case is the highest rate set forth in the

petition and is derived from information provided in the petition.  Moreover, the 198.63 percent

rate was not calculated by Commerce from an actual respondent's information in an investigation

or an administrative review.  Beyond the conclusory and unsupported assertions in the Final

Results that the rate it chose is corroborated and relevant, Commerce has not explained how the

highest rate stated in the petition is probative, and not merely punitive, given the record facts of

this case.  *See Final Results*, 68 Fed. Reg. at 41,307-08.  The facts of this case, while analogous

to those in *Shanghai Taoen* in limited respects, differ in that Commerce merely asserted its

inherent authority to apply the highest rate to uncooperative respondents without conducting an

adequate analysis, or setting forth adequate reasoning, to support a conclusion that the

198.63 percent rate is rationally related to either Gerber's or Green Fresh's sales data.  *See

Redetermination* at 41-54.

## IV. CONCLUSION

The court affirms in part and remands in part the Redetermination for further

administrative proceedings consistent with this Opinion and Order.  As to Gerber, the court

concludes that Commerce supported with substantial record evidence its factual findings that

Gerber withheld information, impeded the investigation, and failed to cooperate to the best of its

ability in complying with the Department's information requests, thereby supporting the

Department's decision to invoke the "facts otherwise available" and "adverse inferences"

provisions of 19 U.S.C. § 1677e as to twenty-four transactions of Gerber. Commerce, however,

unlawfully applied § 1677e by applying to those twenty-four transactions the assessment rate of

198.63 percent, a rate that does not bear a rational relationship to the record evidence pertaining

to Gerber.

As to Green Fresh, the court concludes that Commerce supported with substantial record

evidence its factual findings that Green Fresh withheld information, impeded the investigation,

and failed to cooperate to the best of its ability in complying with certain of the Department's

information requests. Commerce, however, unlawfully applied § 1677e by attributing to Green

Fresh the twenty-four transactions for which it found Gerber to be the producer, seller, and

exporter. Commerce failed to support with substantial record evidence, and did not explain

adequately, its decision to double-count those transactions. Commerce also unlawfully applied

§ 1677e by applying to those twenty-four transactions the highest assessment rate of 198.63

percent, a rate that bears no relationship to the record evidence pertaining to Green Fresh.

## ORDER

For the reasons stated in this Opinion and Order, the court affirms in part and remands in

part the Department's Redetermination Pursuant to Court Remand (Dec. 1, 2005)

("Redetermination"), and it is hereby

**ORDERED** that this matter is remanded for reconsideration and for further
administrative proceedings consistent with this Opinion and Order; it is further

**ORDERED** that Commerce shall recalculate the assessment rates applied to Gerber and
Green Fresh in the Redetermination; it is further

**ORDERED** that if Commerce, in recalculating the assessment rate for Gerber, chooses to invoke the procedures of 19 U.S.C. § 1677e with respect to the twenty-four transactions of Gerber for which it invoked 19 U.S.C. § 1677e in the Redetermination, Commerce shall use a rate other than the rate of 198.63 percent and shall use a rate that satisfies the requirements of 19 U.S.C. § 1677e as discussed in this Opinion, including the corroboration requirement set forth therein; it is further

**ORDERED** that Commerce, in recalculating the assessment rate for Green Fresh, may not rely on the analysis found to be contrary to law in this Opinion and Order, under which analysis Commerce attributed to Green Fresh the twenty-four transactions on which it invoked 19 U.S.C. § 1677e in the Redetermination, which transactions are shown by record evidence to have involved merchandise produced, sold, and exported by Gerber; and it is further

**ORDERED** that Commerce shall have one hundred twenty (120) days from the date of this order to complete and file its remand determination; plaintiffs shall have forty-five (45) days from that filing to file comments; and defendant and defendant-intervenor shall have thirty (30) days after plaintiffs' comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  May 24, 2007
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                          Deputy Clerk